## PALMER v. GULF PUB. CO.
### No. 7614.

United States District Court
S. D. California
Central Division.
July 13, 1948.

732

YANKWICH, District Judge.

## I.

### The Nature of the Controversy.

The action is for trademark infringement and unfair competition. The sole remedy sought by the plaintiff is injunction of the use of the title "World Oil" by the defendant for its monthly trade publication. Back of the controversy are certain undisputed facts.

The plaintiff, Mona Palmer, as trustee, under the Last Will and Testament of Russell Palmer, deceased, is the owner and publisher of the trade journal bearing the name "World Petroleum". As surviving partner of the partnership, Palmer Publications, which consisted of Mona Palmer and her deceased husband, Russell Palmer, she is also the publisher of the trade journal named "Petroleum World." The management of these publications is under the direction of Rex Wadman as general manager. "World Petroleum" is published in New York, "Petroleum World" in California. Both trade journals are published once a month and are intended for the oil industry. "World Petroleum" is circulated in the United States, Canada, England and other countries, while "Petroleum World" is sectional in interest and devoted primarily to California. A copy of the front page of the former is reproduced at the end of the opinion.[1]

The defendant, The Gulf Publishing Company, formerly used the name "The Oil Weekly" for a trade publication also circulated in the oil industry. It had originally only a sectional circulation, but, later, its operations assumed an international scope. It, too, was circulated in the United States, Canada, England and certain other countries. In the issue of "Oil Weekly" of June 2, 1947, and by other means, the defendant published an announcement of change of name from "The Oil Weekly" to "World Oil," the change to be made effective with the issue of July 7, 1942. Subsequent announcements by the defendant of its change of name were made between June 2, 1947, and July 7, 1947. Plaintiff received notice of the prospective change on or about June 2, 1947.

Kenneth E. Grant and Richard A. Perkins, both of Los Angeles, Cal., for plaintiff.

Harris, Kiech, Foster & Harris, by Ward D. Foster and Ford Harris, Jr., all of Los Angeles, Cal., and Fulbright, Crooker, Freeman & Bates and Leon Jaworski, all of Houston, Tex., for defendant.

---

[1] See photostat at end of Opinion. (Exhibit 18)

On June 16, 1947, "World Petroleum" circulated a letter to all its then advertisers and prospective advertisers and advertising agencies with whom it did or expected to do business, commenting on the defendant's change of name from "The Oil Weekly" to "World Oil." "Petroleum World" circulated a letter, entitled "Thank you, Mr. Dudley," written on its letterhead. A copy of the letter reached the defendant. By letter, dated July 23, 1947, written by the plaintiff's attorney to the defendant, complaint was made about the change of name from "The Oil Weekly" to "World Oil." The letter was received by the defendant on July 25, 1947.

"World Petroleum" has a circulation of approximately 9,000, not less than ninety percent of which falls within what is termed "controlled circulation," which means that the publication is sent free to advertisers and to such patrons in the oil industry as are most likely to purchase advertised products. "World Oil" has paid subscribers only, its paid circulation being approximately 17,000. *Neither "World Petroleum" nor "World Oil" is sold at news stands.*

"World Petroleum" is sustained by advertising revenue. Approximately ninety per cent of the advertising placed in it is through advertising agencies, which investigate the advertising media used.

From the first publication under the new name of "World Oil" until the present time, the defendant has carried at the top of the cover page of its publication the legend: "Established 1916 as The Oil Weekly", as shown by a cover page photostated at the end of the opinion.[2] A reference to the successorship of "The Oil Weekly" is also carried on the defendant's letterheads.

"World Petroleum" was registered as a trademark (No. 292796) on April 28, 1931, after full compliance with the requirement of the statutes.[3] Other facts will appear further on in the discussion.

The controversy centers around the similarity of names. Plaintiff insists that both under the presumption of legality which attaches to the trademark registration, and under the principles evolved by courts in unfair competition cases, she has the right to be protected against the use of "World Oil", a designation which she asserts is so similar to hers as to result in that confusion which the law condemns.

Three recent decisions of the Circuit Court of Appeals for the Ninth Circuit[4] have treated the problem of similarity arising in proper name cases and in others so fully that any discussion may well be confined to such distinctive features as appear in this case.

The problem here is the use of ordinary words to designate a trade publication.

## II.

### Protection of Trade Names.

(A) *Common and Fanciful Names:*

 Common words used to designate a trade publication are not protected, unless through long use and design, format, symbols, and other distinctive characteristics, they are identified with the particular publication. This is but an application to the publishing field of the rule which applies to the designation of other businesses. It has even been applied to geographical names, which are not, ordinarily, the subject of appropriation.[5]

---

[2] See photostat at end of Opinion. (Exhibit 17)

[3] 15 U.S.C.A. § 81 et seq.

[4] Lerner Stores Corp. v. Lerner, 9 Cir., 1947, 162 F.2d 160; Stork Restaurant v. Sahati, 9 Cir., 1948, 166 F.2d 348; Brooks Bros. v. Brooks Clothing Co. of Cal., D.C.Cal., 1945, 60 F.Supp. 442. The last is one of my own cases in which the Circuit Court adopted my opinion in its entirety and affirmed. Because of this and denial of certiorari, the opinion acquires the character of finality.

[5] Modesto Creamery v. Stanislaus Creamery Co., 1914, 168 Cal. 289, 142 P. 845; Carolina Pines, Inc. v. Catalina Pines, 1932, 128 Cal.App. 84, 16 P.2d 781. Aside from some procedural advantage, *the registration of the mark confers no greater rights.* As said by Judge Learned Hand in Emerson Electric Mfg. Co. v. Emerson Radio & P. Corp., 1939, 105 F.2d 908, 910:

"* * * if one merchant has established a business under his name in wares of one sort, a second merchant may not use that name in selling other wares, if these are so like the first merchant's that

Fanciful names are a special object of the law's protection. The law on the subject is summed up in the most recent case from the Ninth Circuit Court of Appeals:

"The 'Stork Club' is a trade name that, in the language of the books, might well be described as 'odd,' 'fanciful,' 'strange,' and 'truly arbitrary.' It is in no way descriptive of the appellant's night club, for in its primary significance it would denote a club for storks. Nor is it likely that the sophisticates who are its most publicized customers are particularly interested in the stork.

"It is not a trade name that would naturally suggest itself for a fashionable restaurant. 'Elbow Room,' the name adopted by one of the predecessors of the appellees, would have been more appropriate. So would 'Stagger Inn,' or even 'Filling Station.'

"In other words, there is little likelihood that the appellant's predecessor and the appellees' predecessor hit upon the names 'The Stork Club' and 'Stork Club', respectively, as acts of independent creation. It seems a clear case of a junior appropriator's seeking to capitalize on the prestige of the senior, of which more hereafter.

"Equity gives a greater degree of protection to 'fanciful' trade names than it accords to names in common use.

"In Arrow Distilleries v. Globe Brewing Co., 4 Cir., 117 F.2d 347, 351, the court said: '* * * the rule that coined or fanciful marks or names should be given a much broader degree of protection than words in common use is sound, for it recognizes not only the orthodox basis of the law of trade-marks that the sale

of the goods of one manufacturer or vendor as those of another should be prevented, but also the fact that in modern business the trade-mark patterns performs the added function of an advertising device, whose value may be injured or destroyed unless protected by the courts.'

"When, as here, an insigne accompanies the 'coined' trade name, there is even greater need for safeguarding the public as well as the senior appropriator from imitations. Rhea v. Bacon, supra, 5 Cir., 87 F.2d [976] at page 977".[6] (Emphasis added)

(B) *Ordinary Words, alone or in combination:*

■ The use of ordinary words either alone or in combination, without more, to describe a publication, is not entitled to protection under the law of trademarks or as unfair competition. Illustrative of the cases is a leading California case.[7] In that case, the American Automobile Association sought protection, by reason of prior use, against the use of the name American Automobile Owners' Association. Ruling against such claim, the Supreme Court of California said:

"The important question presented by the appeal must be determined by an application of the well-established test, which no doubt the trial court applied to the case, to-wit: Would a person exercising that care, caution and power of perception which the public may be expected to exercise in the matter which it has in mind, mistake one of said emblems for the other? *The only points of similarity are to be found in the size and diamond shape (waiving the difference which exists as to the fact that all of the points of the diamond design of*

the public will be apt to think that the first merchant is selling them. We have so held a number of times. * * * We may start by at once laying aside the plaintiff's registration of its name. *That did not enlarge its substantive rights at all; all it did* was to confer jurisdiction on the court and give the registrant certain procedural advantages. Ungles-Hoggette Mfg. Co. v. Farmers' H. & G. P. Co., 8 Cir., 232 F. 116; Scandinavia Belting Co. v. Asbestos & Rubber Works, 2 Cir., 257 F. 937, 952; Armour & Co. v. Louisville Provision Co., 6 Cir., 283 F. 42, 45; Charles Broadway Rouss, Inc.

v. Winchester Co., 2 Cir., 300 F. 706, 712; Kellogg Co. v. National Biscuit Co., 2 Cir., 71 F.2d 662, 666." (Emphasis added)

And see the language of Mr. Justice Holmes in Prestonettes, Inc. v. Coty, 1924, 264 U.S. 359, at 368, 44 S.Ct. 350, 68 L.Ed. 731.

6 Stork Restaurant v. Sahati, supra, 166 F.2d at page 355; and see, Chaplin v. Amador, 1928, 93 Cal.App. 358, 269 P. 544.

7 American Automobile Ass'n v. American Automobile Owners Ass'n, 1932, 216 Cal. 125, 13 P.2d 707, 82 A.L.R. 699.

*plaintiff California State Automobile Association are pointed, and two of said points of the diamond design of respondent are truncated), and in the small blue border, and in the similarity as to metal color of the smaller lettering on the border. In all other respects they are different as to name, abbreviations, size and style of letters, design of motto, and color. Placed at any point within the distance of visual discernment they present an entirely different picture which could not deceive a person of normal discernment into the error of mistaking one for the other. No claim is made as to the right of monopoly by reason of copyright or trademark of the letters AAA, or as to the exclusive right of appellants to appropriate the words 'American Automobile,' for the reason that these words are in common use and are regarded by the law as common property, which may be used by others in combination with other descriptive words, provided they are not used in combination with such other words or symbols or designs as to render it probable that they would mislead persons possessing ordinary powers of perception. Generic terms and words descriptive of place are not subject to exclusive appropriation.* No legal objection could be urged against the formation of an association to be known as the American Automobile Association of South America, or the American Automobile and Motor Association, as such. That neither could impinge upon the AAA symbol adopted and used by the American Automobile Association is clear for the sufficient reason that said three letters in combination had previously been adopted by the American Automobile Association as its symbol. The fact that said letters do not correctly initial the true name of either of said other associations would be an additional circumstance against a claim of right.

"No claim of exclusive appropriation of diamond-shaped labels can be sustained, because of diamond-shaped designs have been in use for many years and are commonly used in magazine, periodical, label, and sticker forms of advertising."[8] (Emphasis added)

In this, the Court followed a long line of its own decisions, some of which will be referred to presently, in which analogous rulings were made. Thus, in an early case, the Court held that although a person had been engaged in business under the name of "Antiquarian Book Store," a later arrival could use the words "Antiquarian Book and Variety Store."[9] In a later case, the court ruled that the use of the name "Los Angeles Van, Truck and Storage Company" did not stand in the way of a later arrival's use of the name "Los Angeles Van and Storage Company."[10]

These decisions are bottomed on federal rulings to be adverted to, which accord in principle. The one most often referred to and which states the principles involved here very fully denied priority rights to a publication entitled "College Humor" against a later publication named "College Comics", although they occupied the same field.[11] That case has a very succinct statement which has been quoted often in other cases as illustrative of the similarities in publication names which have been tolerated.[12]

" 'The plaintiff claims that the similarity of defendants' name "College Comics" and the slogan "College Wit—The World's Best Humor" to plaintiff's name, and the resemblance in the dress-up of the two magazines, have caused confusion among purchasers, and that plaintiff has been injured thereby.

" 'There was some confusion, but it was due to the carelessness or inattention of dealers and purchasers who did not know a new magazine had come out. Such confusion is to be expected at first, where a new magazine enters the field dealing with

---

[8] American Automobile Ass'n v. American Automobile Owners Ass'n, supra, 216 Cal. at pages 131, 132, 13 P.2d 707, 710, 82 A.L.R. 699.

[9] Choynski v. Cohen, 1870, 39 Cal. 501, 2 Am.Rep. 476; Dunston v. Los Angeles Van & Storage Co., 1913, 165 Cal. 89, 131 P. 115.

[10] See also, Southern California Fish Co. v. White Star Canning Co., 1920, 45 Cal.App. 426, 187 P. 981.

[11] Collegiate World Publishing Co. v. Du Pont Publishing Co., 1926, D.C.Ill., 14 F.2d 158.

[12] Collegiate World Publishing Co. v. Du Pont Publishing Co., 14 F.2d at page 160.

the same general subject-matter as a magazine already on the market. This confusion was negligible, and would soon disappear as the reading public came to know there were two magazines dealing with the humorous side of college life. The confusion that existed was due to the fact that plaintiff selected descriptive words for its name.

" 'Similarity in names of magazines dealing with the same subject is not unusual, but on the contrary is quite common, *such as Popular Science, Popular Mechanics; Outdoor Life, Outdoor Recreation; Field and Stream, Forest and Stream; Boy's Life, Boy's Magazine; Ladies Home Journal, People's Home Journal; Radio Doings, Radio Digest, Radio World, Radio Age, Radio Progress, Radio News, Radio Broadcast; Motor, The Motor, Motor Transport, Motor Record, Motor World, Motor Age, Motor Life, etc.' "[12]* (Emphasis added)

A statement of the indicia of differentiation by Mr. Justice Brewer, while sitting at Circuit, is very enlightening:

"The difference is such that the eye will take it in at a moment's glance. Summing it all up, while there are certain minor points of resemblance which have been forcibly urged upon our attention by the counsel for plaintiff, yet, looking at the two packages with their labels,—taking the tout ensemble,—it appears to us clear that they are so essentially different that no one of ordinary intelligence, desiring to buy the one kind of tobacco, would be misled into buying a package of the other. We shall not stop to review the testimony which is offered upon the question whether the resemblances between the two packages and labels were calculated to mislead, or whether in fact they did operate to mislead. It is enough to say that there was testimony on both sides of these questions, and perhaps, looking at the matter of testimony alone, it might be difficult to say on which was the preponderance; but such testimony, giving it all the weight that it is entitled to, does not disturb the conclusions which we have reached from an inspection of the packages and labels themselves. *We cannot surrender our own judgment in this matter because others may be of a different opinion, or because it happens, in isolated instances, that some purchaser was so careless as not to detect the differences. It may well be that, where many sales were made, some individuals, not particularly attentive, may have purchased the defendant's supposing they were purchasing the plaintiff's, package.* Such things will happen in the ordinary course of business, no matter how great the differences; and the fact that they do happen, while it is not to be ignored, is not to outweigh the evidence which comes from a personal inspection of the packages and labels."[13] (Emphasis added)

Without further elaboration, we place in juxtaposition certain names which have been held not to establish priority of right. "United States Investors"—"Investors"[14]; "Popular Mechanics"—"Modern Mechanics"[15]; "Ranch Romances"—"Rangeland

---

[13] P. Lorillard Co. v. Peper, 8 Cir., 1898, 86 F. 956, 960.

[14] Investor Publishing Co. of Mass. v. Dobinson, D.C.Cal.1897, 82 F. 56 (per Wellborn, Judge).

[15] Fawcett Publications v. Popular Mechanics, 3 Cir., 1935, 80 F.2d 194. It is significant that in this case rights flowing from prior use were denied, although the appellant in the case had been denied by the Commissioner of Patents registration of his trademark of "Modern Mechanics," on the ground of similarity, a ruling which was sustained by the Court of Customs and Patent Appeals. See Fawcett Publications v. Popular Mechanics, 1932, 58 F.2d 838, 19 C.C.P.A., Patents, 1241. This confirms the view expressed at the trial that in determining validity of trademarks and the existence or non-existence of unfair competition, we are governed by entirely different principles than when reviewing the action of the Commissioner of Patents in exercising his power to reject a trademark application on the ground of similarity. And that, consequently, such cases as the leading case on which counsel for the plaintiff relies. (Crime Confessions, Inc. v. Fawcett Publications, 1943, 139 F.2d 499, 31 C.C.P.A., Patents, 760) are not conclusive of the issues here. For, as the *decision just discussed indicates*, we may, on the basis of facts before us, arrive at an entirely different conclusion from that arrived at by the Commissioner. The same reasoning applies to Architectural Catalogue Co. v. F. W. Dodge Corp., 1943, 136 F.2d 1008, 30 C.C.P.A., Patents, 1215.

Romances"[16]; "Aviation"—"American Aviation"[17] "Flying"—"Flying Aces"[18].

Cases other than those already referred to[19] in which a seemingly contrary view was reached either relate to the exercise of discretion by an administrative officer, such as the Commissioner of Patents, in allowing the use of a certain name as a trademark, or involve names which are not purely descriptive, or, if descriptive, are given a fanciful appearance by the manner of their being set up.[20]

Counsel for the plaintiff have stressed the theory which would solve the problem in these cases by the "dominant word" test. Under it, in determining similarity, we are to seek the dominant word in the title, and, if priority of use is established, then the late comer in the field is to be restrained from using it in conjunction with a similar designation.[21]

While generalizations are, at times, helpful in giving us a thread or a criterion of similarity or dissimilarity, ultimately, the determination of a case involving trademark infringement or unfair competition, calls for pragmatic action. Each case must be determined in the light of its particular facts. As said by Circuit Judge Chase:

"Whether the publisher of a magazine is guilty of unfair competition when he adopts a portion of the title of another magazine is generally a *mixed question of law and fact*. Fawcett Publications v. Popular Mechanics Co., 3 Cir., 80 F.2d 194. Each individual case must be decided on its own facts, and just as is true of infringe-

ment cases (Glenmore Distilleries Co. **v.** National Distillers Products Corp., D.C., 23 F.Supp. 928, affirmed 4 Cir., 101 F.2d 479), the reported cases are helpful to show the general principles to be applied in reaching a decision. *Thus instances in which it has been held in a particular set of facts that unfair competition existed do not preclude a court from reaching a contrary conclusion in a later case having somewhat similar facts.*[22] (Emphasis added)

These observations are of particular pertinency to a case of this character when the magazines involved are circulated not before the general public, but to a selected group in an industrial field, which is not likely to be deceived by such similarity in the designation of a magazine as is inevitable when the words are purely descriptive. And here, as will presently be shown, the external appearances of the magazine are so dissimilar that "to the eye there is not the slightest danger of deception."[23]

## II

### The Facts in the Case.

We apply these principles to the facts here.

An examination of the covers and title pages, photostats of which are attached to this opinion (see Exhibits 17, 18, Q and R), shows conclusively the dissimilarity in appearance. "World Petroleum" has the larger format. Its color scheme is very sedate,—*black and white.* "World Oil" prints its title in white against an *Alice blue* background. "World Petroleum" uses two

---

[16] Warner Publications v. Popular Publications, 1937, 2 Cir., 87 F.2d 913.

[17] McGraw-Hill Publishing Co. v. American Aviation Associates, 1940, 73 App.D. C. 131, 117 F.2d 293.

[18] Magazine Publishers v. Ziff-Davis Publishing Co., 2 Cir., 1945, 147 F.2d 182.

[19] See cases in Note 15.

[20] Photoplay Publishing Co. v. La Verne Publishing Co., 3 Cir., 1921, 269 F. 730; Barton v. Rex-Oil Co., 3 Cir., 1924, 2 F.2d 402, 40 A.L.R. 424; Barton v. Rex-Oil Co., 1928, 3 Cir., 29 F.2d 474; Pennsylvania Petroleum Co. v. Pennzoil Co., 1935, 30 F.2d 67, 23 C.C.P.A., Patents, 706. Fawcett Publications v. Real Confessions, (Supreme Court Special Term) 1945, 59 N.Y.S.2d 598, in so far as it

may warrant a different inference, conflicts with the cases just discussed. And as the decision in this case must be governed by the law of the Ninth Circuit and of the State of California, it does not command assent.

[21] Handler & Pickett, "Trademarks and Trade Names," 1930, 30 Columbia Law Review, 168, 759. I have adverted to this doctrine in Brooks Bros. v. Brooks Clothing Co. of California, D.C.Cal.1945, 60 F. Supp. 442, at page 450, and cases cited in Note 17.

[22] Magazine Publishers v. Ziff-Davis Publishing Co., 2 Cir., 1945, 147 F.2d 182, 185.

[23] Warner Publications v. Popular Publications, 2 Cir., 1937, 87 F.2d 913, 914.

celestial globes or spheres as an emblem. "World Oil" uses a doubly traced circle with an arrow through it. "World Petroleum" does not have advertisements on the cover page. "World Oil" uses multicolored advertisements on its cover.

So, the format, the type used, the color scheme, the set-up of the cover and of the front page (or table of contents), the decorative emblems used, are as unlike as they could be made. *They are all designed not to create, but to avoid confusion.* If, to this, we add the fact that the defendant carries above the masthead of "World Oil" the legend "Established in 1916 as The Oil Weekly" and that the words "The Oil Weekly" are in white type, smaller but of the same kind as the main title, and are directly above the word "World" so that anyone looking at the title would immediately see it in combination with those words, we have a case in which the late comer is *shown to have taken every conceivable precaution to avoid confusion with any similar publication which preceded it in the field.* Such precautions do not spell a desire to create confusion, but a meticulous determination to resort to the most punctilious means to avoid it.[24] Consider also the following facts: The publications are not sold to the general public, but are circulated among the members of a specialized group. Neither publisher is interested in the public's generally buying his specialised trade journal. "World Petroleum" is sent gratis to executive personnel in the oil industry. "World Oil," although sold to subscribers, reaches an equally limited field of oil industry executives. In both instances, the persons receiving the publications are in charge of sales of oil equipment to promote which advertising might be necessary. Advertisements are secured through advertising agencies. In the light of these facts, it would require an unjustifiable stretch of imagination to hold that—absent any legally recognizable rights—the plaintiff has the exclusive right to the use of the word "World" in conjunction with any word synonymous with "petroleum," or that such use would have a tendency to mislead.[25]

■■ For it is the tendency to mislead and not the actual result which is the test.[26] The plaintiff in a case of this character need not prove actual confusion. However, the plaintiff has offered some incidents which it is claimed show confusive results. Reduced to their essence, they consist of undelivered letters, misdirected telephone calls and telephone calls to persons connected with one rather than the other of the publications. These are of small significance, and entitled to little weight. They are the type which, as Mr. Justice Brewer stated on one occasion, are traceable to the *"careless"* or to persons *"not particularly attentive,"* and which *"will happen in the ordinary course of business, no matter how great the differences."* [27] (Emphasis added)

As said by the present Chief Justice of the United States, when he was Associate Justice of the United States Court of Appeals for the District of Columbia:

*"A publisher though he has a registered trademark cannot be protected from all of the inadequacies of human thought and memory. * * * Probable confusion cannot be shown by pointing out that at some place, at some time, some one made a false*

---

[24] What has just been said is significant when we bear in mind that courts have repeatedly held in "proper name" cases that a legend of this type is sufficient to differentiate one name from another. See, Handler & Pickett, "Trademarks and Trade Names," 1930, Columbia Law Review, 168, 759; and see Waterman Co. v. Modern Pen Co., 1914, 235 U.S. 88, 35 S.Ct. 91, 59 L.Ed. 142; Prestonette Inc. v. Coty, 1924, 264 U.S. 359, 44 S.Ct. 350, 68 L.Ed. 731; Lerner Stores Corp. v. Lerner, 9 Cir., 1947, 162 F.2d 160, 164.

[25] In this respect, it should be noted that if we adopt the test of dominancy, the word "petroleum" would have to be given that designation. For it is evident from the record that in the industry, the word is not used, except in scientific publications or specifications, and that persons engaged in the production and distribution of petroleum products or in the making of oil tools, machinery or equipment refer to their industry as "oil business," "oil tool business" or "oil machinery business."

[26] Brooks Bros. v. Brooks Clothing Co. of California, D.C.Cal.1945, 60 F.Supp. 442; Stork Restaurant v. Sahati, 9 Cir., 1948, 166 F.2d 248.

[27] P. Lorillard Co. v. Peper, 8 Cir., 1898, 86 F. 956, at page 960.

*identification.* The plaintiff did not show one instance of a newsstand purchaser receiving the magazine he did not intend to buy. Under both methods of determination, we conclude, without hesitation, that the defendant's title does not infringe the plaintiff's registered trademark." [28] (Emphasis added)

More, we have the fact that Rex Wadman, the General Manager of the plaintiff's publications, stated emphatically at the trial that he knew *of no instance* of anyone's subscribing to the defendant's magazine or sending for it in the belief that it was the plaintiff's, or of any agency or person concluding an advertising contract or placing a *single* advertisement with the defendant's publication in the belief that they were dealing with the plaintiff.

So we have no diversion of advertising patronage. Indeed, none such is likely to occur, because many advertisers in the oil business, *advisedly and with full knowledge of facts,* actually use both publications as media. On the whole, there cannot be, under the circumstances existing in this case, the confusion of source which the law of trademarks and unfair competition condemns.

We conclude:

1. The trademark registration of April 28, 1931, did not confer on the plaintiff the exclusive right to the use of the word "World" with words synonymous to "petroleum," such as "oil," as the name of a publication.

2. The use by the plaintiff of the word "World" in combination with "Petroleum" has not been so identified in the oil industry with the plaintiff's publication as to prevent its use in combination with the word "Oil" by the defendant.

3. The use of the words "World Oil" to designate a trade journal does not have the tendency to confound persons in the oil industry to whom the publications are addressed or who seek them as media for advertising their products.

4. The differences in format, make-up, type, color scheme, identifying symbols and the legend "Established in 1916 as the Oil Weekly" and other characteristic marks indicate clearly the distinctiveness of each publication.

5. The use of the designation "World Oil" for the defendant's publication is not an infringement of the plaintiff's rights under its trademark.

6. The use of the designation "World Oil" for the defendant's publication is not unfair competition.

Judgment will, therefore, be for the defendant that the plaintiff take nothing by its Complaint

NOTE: Full findings and decree are attached as Appendices A and B.

\* \* \* \* \* \*

## APPENDIX A.

The above entitled cause came on regularly for trial on June 22, 1948, before

---

[28] McGraw-Hill Publishing Co. v. American Aviation Associates, 1940, 73 App.D.C. 131, 117 F.2d 293, 295.

The following quotation from Zangerle & Peterson Co. v. Venice Furniture Novelty Mfg. Co., 7 Cir., 1943, 133 F.2d 266, 270, contains a good summary of the means for determining identity of source where there has been no wilful "palming off":

"Since there was no actual 'palming off' by the defendant, or evidence that it knowingly did anything to induce or assist another to do so, there can be no unfair competition unless the plaintiff has clearly established that its table has acquired in the trade a secondary meaning, in which event the mere copying may be unfair competition. *To establish secondardy meaning, the article itself must be so clearly identified with its source that its supply from any other source is clearly calculated to deceive the public and lead it to purchase the goods of one for that of another.* Sinko v. Snow Craggs Corp., 7 Cir., 105 F.2d 450. To acquire a secondary meaning in the minds of the buying public, an article of merchandise when shown to a prospective customer must prompt the affirmation, 'That is the article I want because I know its source,' and not the negative inquiry as to, 'Who makes that article?' *In other words, the article must proclaim its identification with its source, and not simply stimulate inquiry about it.*" (Emphasis added)

This language might well have been written with the facts of this case in view, so cogently does it fit them.

the Honorable Leon R. Yankwich, Judge of the United States District Court for the Southern District of California, sitting without a jury, and was concluded on June 24, 1948. Richard A. Perkins, Esq., appeared as counsel for the plaintiff and Harris, Kiech, Foster & Harris, Esqs., by Ward D. Foster, Esq., and Fulbright, Crooker, Freeman & Bates, Esqs., by Leon Jaworski, Esq., appeared as counsel for the defendant. Oral and documentary evidence was introduced on behalf of both parties and the Court, having considered the same and the briefs of counsel filed prior to the trial and the arguments of counsel during the trial, the cause was submitted to the Court for its decision. The Court, heretofore, on the 13th day of July, 1948, filed its opinion and, separately, its order that, upon the grounds stated in said opinion, judgment will be for the defendant that the plaintiff take nothing by its complaint. And the Court now being fully advised, makes and files the following as its Findings of Fact:

### Findings of Fact

I. The jurisdiction of this Court is based upon diversity of citizenship and upon alleged infringement of a trade-mark used in commerce between the several states of the United States and between the United States and foreign nations and upon alleged infringement of a trade-mark registered in the United States Patent Office in accordance with the Trade-Mark Act of February 20, 1905, 15 U.S.C.A. § 81 et seq.

(a) The plaintiff, Mona Palmer, is a citizen of the State of California.

(b) The defendant, The Gulf Publishing Company, is a corporation duly organized under the laws of the State of Texas. It has its principal place of business in the City of Houston, Texas.

(c) The matter in controversy exceeds, exclusive of interest and costs, the sum of Three Thousand Dollars.

II. Plaintiff, Mona Palmer, as trustee under the Last Will and Testament of Russell Palmer, deceased, is the owner and publisher of the trade journal bearing the name "World Petroleum". As surviving partner of the partnership, Palmer Publi-cations, which consisted of Mona Palmer and her deceased husband, Russell Palmer, she is also the publisher of the trade journal bearing the name "Petroleum World." The management of these publications is under the direction of Rex Wadman as general manager. "World Petroleum" is published in New York, "Petroleum World" in California. Both trade journals are published once a month and are intended for the oil industry. "World Petroleum" is circulated in the United States, Canada, England and other countries, while "Petroleum World" is sectional in interest and devoted primarily to California.

III. The defendant, The Gulf Publishing Company, formerly used the name "The Oil Weekly" for a trade publication also circulated in the oil industry. It had originally only a sectional circulation, but later, its operations assumed an international scope. It, too, was circulated in the United States, Canada, England and certain other countries. In the issue of "The Oil Weekly" of June 2, 1947, and by other means, defendant published an announcement of change of name from "The Oil Weekly" to "World Oil," such change to be made effective with the issue of July 7, 1947. Subsequent announcements by the defendant of its change of name were made between June 2, 1947, and July 7, 1947. Plaintiff received notice of such prospective change on or about June 2, 1947.

IV. On June 16, 1947, "World Petroleum" circulated a letter to all its then advertisers and prospective advertisers and advertising agencies with whom it did business or expected to do so, commenting on defendant's change of name from "The Oil Weekly" to "World Oil." "Petroleum World" circulated a letter, entitled "Thank you, Mr. Dudley," written on its letterhead. A copy of the letter reached defendant. By letter, dated July 23, 1947, written by the plaintiff's attorney to the defendant, complaint was made about the change of name from "The Oil Weekly" to "World Oil." The letter was received by the defendant on July 25, 1947.

V. "World Petroleum" has a circulation of approximately 9,000, not less than

ninety percent of which falls within what is termed "controlled circulation," which means that the publication is sent free to advertisers and to patrons in the oil industry most likely to purchase advertised products. "World Oil" has paid subscribers only, and its paid circulation is approximately 17,000. *Neither "World Petroleum" nor "World Oil" is sold at newsstands.* The publishers of "World Petroleum" and "World Oil"are not interested in the public generally buying their trade journals.

VI. "World Petroleum" is sustained on advertising revenue. Approximately ninety percent of the advertising placed in it is through advertising agencies, the duty of which it is to make an investigation of the periodical.

VII. From the time of the first publication under the new name of "World Oil" until the present time, the defendant has carried at the top of the cover page of its publication the legend: "Established 1916 as The Oil Weekly." A reference to the successorship of "The Oil Weekly" is also carried on the defendant's letterheads.

VIII. "World Petroleum" was registered as a trade-mark (No. 292796) on April 28, 1931.

IX. The external appearances of the two magazines "World Oil" and "World Petroleum" are so dissimilar that "to the eye, there is not the slightest danger of deception." "World Petroleum" has the larger format. Its color scheme is a very sedate combination of colors. "World Oil" always prints its title in white against an Alice blue background. "World Petroleum" uses two celestial globes or spheres as an emblem. "World Oil" uses a doubly traced circle with an arrow through it. "World Petroleum" does not have advertisements on the cover page. "World Oil" uses multi-colored advertisements on its cover. In fact, the format, the type used, the color scheme, the set-up of the cover and of the front page (or table of contents), the decorative emblems used, are as unlike as they could be made. They are all designed not to create, but to avoid confusion.

X. In the legend "Established 1916 as The Oil Weekly" the words "The Oil Weekly" are in white type, smaller but of the same kind as the main title and are directly above the word "world" so that anyone looking at the title would immediately see it in combination with those words. This legend also appears on the defendant's letterheads, in its advertisements, advertising contracts, invoices and other printed matter used in the conduct of its business. The defendant extensively advertised its intention to change the name of its publication to "World Oil" prior to the change and also advertised the new name on a large scale after the change was made. The defendant has taken every conceivable precaution to avoid confusion with any similar publication which preceded it in the field and the Court finds that it has exercised at all times a meticulous determination to resort to the most punctilious means to avoid any confusion.

XI. The publications are not sold to the general public but are circulated among the members of a specialized group. "World Petroleum" is sent gratis to executive personnel in the oil industry; "World Oil," although sold to subscribers, reaches an equally limited field of oil industry executives. In both instances, the persons receiving the publications are in charge of sales of oil equipment to promote which advertising might be necessary. Advertisements are secured through advertising agencies, the duty of which it is to make an investigation of the magazine before inserting advertisements. In the light of these facts, the court finds that the use of the word "world" in conjunction with any other word synonymous with "petroleum" does not have a tendency to mislead advertisers or subscribers into believing that they are dealing with plaintiff's magazine, "World Petroleum."

XII. The Court finds that if there is a dominant word in the title "World Petroleum," it is the word "petroleum." For it is evident from the record and the Court finds it to be a fact that in the industry, the word is not used, except in scientific publications or specifications, and that persons engaged in the production and distribution of petroleum products or in the making of oil tools, machinery or equipment, refer to their industry as "oil busi-

ness," "oil tool business," or "oil machinery business."

XIII. The Court finds that there is no evidence of any instance of substantial or material confusion. The offer of some incidents which plaintiff claimed showed confusive results are the type which are traceable to the "careless" or to persons "not particularly attentive" and are incidents which "will happen in the ordinary course of business, no matter how great the difference." These incidents are of small significance and entitled to little weight. None of these incidents involved the loss of any business or good will. In fact, Rex Wadman, the general manager of plaintiff's publications, testified emphatically that he knew of no instance of anyone's subscribing to the defendant's magazine or sending for it in the belief that it was the plaintiff's or of any agency or persons concluding an advertising contract or placing a single advertisement with the defendant's publication in the belief that it was that of the plaintiff.

XIV. The Court finds that there has been no diversion of advertising patronage, that none is likely to occur and that on the whole there cannot be, under the circumstances existing in this case, any confusion of source.

XV. The Court finds that the use by the plaintiff of the word "World" in combination with "Petroleum" has not been so identified in the oil industry with the plaintiff's publication as to prevent its use in combination with the word "Oil" by the defendant.

XVI. Except as herein otherwise found, the Court finds the allegations of plaintiff's amended complaint to be untrue.

By reason of the foregoing facts, the Court now finds the following as its Conclusions of Law:

### Conclusions of Law

That the defendant is entitled to the judgment of this Court ordering, adjudging and decreeing as follows:

1. That the trade-mark registration of April 28, 1931, did not confer on the plaintiff the exclusive right to the use of the word "World" with words synonymous to "petroleum," such as "oil", as the name of a publication.

2. That the use by the plaintiff of the word "World" in combination with "Petroleum" has not been so identified in the oil industry with the plaintiff's publication as to prevent its use in combination with the word "Oil" by the defendant.

3. That the use of the words "World Oil" to designate a trade journal does not have the tendency to confound persons in the oil industry to whom the publications are addressed or who seek them as media for advertising their products.

4. That the differences in format, make-up, type, color scheme, identifying symbols and the legend "Established in 1916 as The Oil Weekly" and other characteristic marks indicate clearly the distinctiveness of each publication.

5. That the use of the designation "World Oil" for the defendant's publication is not an infringement of the plaintiff's rights under its trade-mark.

6. That the use of the designation "World Oil" for the defendant's publication is not unfair competition.

7. That the plaintiff take nothing by its complaint and the defendant recover its costs.

Judgment is ordered entered accordingly.

\* \* \* \* \* \*

### APPENDIX B.

#### Judgment and Decree

The above entitled cause came on regularly for trial on June 22, 1948, before the Honorable Leon R. Yankwich, Judge of the United States District Court for the Southern District of California, sitting without a jury. Said trial was concluded on June 24, 1948. Richard A. Perkins, Esq., appeared as counsel for the plaintiff and Harris, Kiech, Foster & Harris, Esqs., by Ward D. Foster, Esq., and Fulbright, Crooker, Freeman & Bates, Esqs., by Leon Jaworski, Esq., appeared as counsel for the defendant. Oral and documentary evidence was introduced on behalf of both parties and the Court, having considered the same

and the briefs of counsel filed prior to the trial and the arguments of counsel during the trial, the cause was submitted to the Court for its decision. The Court, heretofore, on the 13th day of July, 1948, filed its opinion and, separately, its order, that upon the grounds stated in said opinion judgment will be for the defendant that the plaintiff take nothing by her complaint. And the Court now being fully advised, and having made and filed its Findings of Fact and Conclusions of Law:

It is ordered, adjudged and decreed that the plaintiff take nothing by her complaint, that the defendant go hence without day and that the defendant have and recover from plaintiff its costs in its behalf expended, for which let execution issue.

Exhibit 18

WORLD PETROLEUM

MAY, 1948 FIVE DOLLARS PER YEAR FIFTY CENTS PER COPY

744

Exhibit 17

Exhibit Q.

**W O R L D P E T R O L E U M**

PUBLISHED BY MONA PALMER

THE MANAGEMENT PUBLICATION OF THE INTERNATIONAL PETROLEUM INDUSTRY

VOLUME 19 MAY, 1948 NUMBER 5

E. W. Moye
Editor

J. C. Chatfield
Managing Editor

Richard Sala
Art Director

SUBSCRIPTIONS

Annual subscription $6.00 (U.S.) postpaid
Single copies 50 cents

GENERAL OFFICES

2 West 45th Street, New York 19, N. Y.
(Tel. Murray Hill 2-1233)

BRANCH OFFICES

LONDON: Evergreen House, St. James, London S. W. 1

CHICAGO: W. R. Carlon, Mid-West Advertising Manager, 307
No. Michigan Ave. (Tel. Franklin 2509)

CLEVELAND: Mr. F. J. Enright, Cleveland Advertising Manager,
2125 Guardian Bldg. (Tel. Main 5499)

DETROIT: R. F. Parker, Michigan Manager, 314 Stephenson Bldg.
(Tel. Trinity 5702)

LOS ANGELES: H. W. S. Johnson, Pacific Advertising Manager,
412 West 6th Street, (Tel. Madison 1591)

NEW YORK 19: R. F. Selecher, Eastern Advertising Manager,
2 West 45th Street (Tel. Murray Hill 2-1233)

TULSA: W. E. P. Casier, Mid-Continent Advertising Manager, 815
Kennedy Bldg. (Tel. 4-1855)

This Month's Cover

CONTENTS

Oil and Steel in the World Crisis ............ 61
Oil Production from Fields in Southwestern Iran ...... 62
World's Most Troubled Refinery ........ 67
Roll of Science Portrays Industry's Progress ...... 71
Special Marine Rig Brings in Producer ...... 72
Non-ads Ideals to Visitors from Abroad ...... 74
Oil Equipment Revolution Revealed at International Exposition .... 76
Mexican Discoveries to Increase Production ...... 96

## WHAT'S NEW IN OIL INDUSTRY EQUIPMENT

746

Exhibit R.

Specialized Oil Publications of
THE GULF PUBLISHING COMPANY
Box 2608, Houston (1), Texas
WORLD OIL and The COMPOSITE CATALOG
for the drilling-producing-pipe line industry
PETROLEUM REFINER and The REFINERY CATALOG
for the refining-natural gasoline industry

# Contents

## JULY 7, 1947
### VOLUME 126, No. 6

RAY L. DUDLEY, President & Publisher
A. L. BURNS, General Manager

EDITORIAL STAFF
WARREN C. BAKER, Editor
J. L. LOGAN, Associate Editor
LeROY STEBBETT, Engineering Editor

DISTRICT EDITORS
HENRY OTANS
220 Park Ave.
New York 17, N. Y.

BERTRAM F. LINZ
Munsey Bldg.
Washington 5, D. C.

ANTHONY GIBBON
WILLIAM P. STEARNE
Hunt Bldg.
Tulsa 3, Okla.

GILBERT M. WILSON
W. R. Barnes Bldg.
Huntington Park, Calif.

R. H. KING
22 Wiggins Blvd.
Fort Worth 2, Texas

R. W. BYRAM
Beazley M
Capitol Station
Austin 71, Texas

GEORGE O. BAPS
SELDON R. HILL
AL BURNS
F. E. KANTRUP
CECIL SMITH
MARY R. POOLE

L. N. TIRATSOO
Kensington Square
SW 10,
London

ADVERTISING STAFF
TOM W. NELSON, Advertising Manager
NELSON BIGELOW
FRANK VICKREY
221 Park Ave.
New York 17, N. Y.

ROBT. MOTHERAL
1010 Lin Bld.
Cleveland 15, Ohio

H. G. FITZPATRICK
332 S. Michigan Ave.
Chicago 4, Ill.

BILL ATCHISON
Hunt Bldg.
Tulsa 3, Okla.

J. W. CARR
W. W. Wilson Bldg.
Huntington Park, Calif.

CHARLES WYATT
1307 Ballato Drive
Houston, Texas

CIRCULATION DEPARTMENT
CLINTON S. QUIN, JR., Manager

## Technical and Feature Articles

OIL PRODUCTION BY REMOTE CONTROL . . . 32
By William S. Stovall, Jr.

MUD-PUMP PISTON LUBRICATION . . . 35

SKELLY OIL COMPANY'S PIPE LINE SYSTEM . . . 36
(22nd of a Series)

NEW DRILLING TECHNIQUE WITH MOTOR-DRIVEN BIT . . . 37
By Anthony Gibbon

AVAILABILITY OF PIPE AND TUBING . . . 40
By W. F. McConnor

INDUSTRY WILL SOLVE PROBLEMS OF TIGHT SUPPLY . . . 44
By Eugene Holman

PRODUCTION HINTS . . . 49

THE DRY ICE MAN COMETH . . . 53

## Monthly International Section

INSERT . . . 48-49

## News and Departments

LOOKING AHEAD . . . 2
THE OUTLOOK . . . 23
THE CHANGING PANORAMA . . . 25
THE WEEK'S NEWS . . . 27
PIPE LINE NEWS . . . 31
PATENT ROUNDUP . . . 53

MARKET TRENDS . . . 54
FIELD OPERATIONS . . . 57
EXPLORATORY FAILURES . . . 74
MEN IN THE INDUSTRY NEWS . . . 75
MANUFACTURERS' NOTES . . . 77
SQUEAKS FROM THE BULL WHEEL . . . 79
ADVERTISERS' INDEX . . . 80

Published every Monday. Single copies 25 cents (except special issues). Subscription price domestic and foreign: $3 a year, 2 years, $5, 3 years, $7. Advertising rates on application. Copyright 1947 by The Gulf Publishing Company.